UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No. 19-246-ESK |
| | : | |
| CREAGHAN HARRY, | : | |
| | : | |
| Defendant. | : | |

### GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY CONDITIONS OF RELEASE

The United States respectfully submits this response in opposition to Defendant Creaghan Harry's motion to modify his conditions of release to "remove the condition of home incarceration (while maintaining electronic monitoring) and remove the condition of computer monitoring software." Dkt. No. 421 at 1. Defendant is not in compliance with the conditions of release set by the Court. Specifically, Defendant's third-party custodian is not maintaining daily contact with him. Relaxing Defendant's conditions of release by allowing him to travel throughout New Jersey and Florida would be unwarranted at this time and would not reasonably assure Defendant's appearance at trial.[1]

### BACKGROUND

On April 5, 2019, Defendant and his co-conspirators (Lester Stockett and Elliott Loewenstern) were indicted with one count of conspiracy to defraud the United States and to pay and receive health care kickbacks, four counts of receiving health care kickbacks, and one count of conspiracy to commit money laundering. Dkt. No. 1. Stockett and Loewenstern subsequently pleaded guilty. *See* Dkt. Nos. 51, 54.

---

[1] The Government does not take a position on Defendant's request to remove the condition of computer monitoring software.

On August 10, 2021, the Grand Jury charged Defendant in a Superseding Indictment. *See* Dkt. No. 197. The Superseding Indictment charged Defendant with the same crimes as the original Indictment and added one count of conspiracy to commit health care and wire fraud, with a statutory maximum of twenty years in prison, and four counts of tax evasion, each with a statutory maximum of five years in prison. *Id.* at 8–18. In addition, the grand jury found that the loss associated with the two charged conspiracies was an actual loss to Medicare of $247 million. *Id.* at 12.

Defendant has had numerous bail hearings since his arrest in 2019. *See, e.g.*, Dkt. No. 20 (May 30, 2019 bail hearing); Dkt. No. 30 (July 11, 2019 bailing hearing); Dkt. No. 44 (Aug. 5, 2019 bail hearing); Dkt. No. 48 (Sept 5, 2019 bail hearing); Minute Entry (June 4, 2021 bail hearing); Dkt. No. 195 (Aug. 11, 2021 bail hearing); Dkt. No. 201 (Aug. 19, 2021 bail hearing); Dkt. No. 202 (Aug. 23, 2021 re-arraignment and bail hearing); Dkt. No. 288 (Mar. 8, 2023 bail hearing); Dkt. No. 322 (Oct. 11, 2023 bail hearing); Dkt. No. 346 (May 21, 2024 bail hearing).

The magistrate judge and district judge who presided over these hearings determined that Defendant presents a substantial risk of flight. *See, e.g.*, Dkt. No. 97 at 1 (Jan. 31, 2020) (acknowledging that "Mr. Harry's release would involve a high risk of flight"); Dkt. No. 119 at 7 (Apr. 22, 2020) (observing that "[t]he risk is great that [Defendant] has the means and the know-how to flee"). This conclusion was supported by, among other things:

> . . . Harry's history of involvement in allegedly fraudulent schemes with international components, history of maintaining bank accounts in the Dominican Republic, Panama, Cyprus, Columbia, Sweden and Switzerland, misrepresentations to Pretrial Services concerning the extent of his foreign travel, his alleged attempts to aid another in avoiding the jurisdiction of the United States and his own statements regarding flight further suggest that Harry presents a risk of flight. He also has ties to the Dominican Republic and Panama, where he resided and is an international traveler.

2

Dkt. No. 119 at 7 (citation omitted).  Additionally, both the magistrate judge and district judge were concerned that Defendant failed to disclose his ownership of a luxury yacht to Pretrial Services, even though it was both a significant asset and generating income for Defendant.  *Id.* at 8.  According to the Court, this "[a]t a minimum," the issue with the yacht "demonstrates a lack of candor with the Court and raises the same concerns first articulated by the Magistrate Judge: the yacht is both a significant foreign asset that [Defendant] could use to support himself after any flight and a means of flight itself." *Id*.

As a result of the foregoing, Defendant has been detained or subject to home incarceration with location monitoring for the duration of this case.  *See* Dkt. No. 15 (May 23, 2019) (order of detention); Dkt. No. 30 (July 11, 2019) (detention continued); Dkt. No. 86 (Dkt. No. 86 (Nov. 15, 2019) (setting conditions of release and specifying Defendant to remain detained until conditions satisfied); Dkt. No. 97 at 5 (Jan. 31, 2020) (vacating Nov. 15, 2019 order setting conditions of release); Dkt. No. 330 at 2 (Feb. 5, 2024) (setting home incarceration as a condition of release); Dkt. No. 347 at 2 (May 21, 2024) (setting home incarceration as a condition of release).  Even when the Court has found Defendant bailable, Defendant's detention has been prolonged by, among other things, offering suretors who (a) subsequently withdrew, (b) were involved in or benefitted from the charged offenses, and/or (c) misrepresented their relationship with Defendant. *See, e.g.*, Tr. at 96 (Aug. 23, 2021) (concluding that surety "was [not] truthful" with law enforcement about the existence of business relationship between him and Defendant).

On May 21, 2024, the Court held a bail hearing that resulted in the current conditions of release.  The conditions included John Burns serving as a third-party custodian.  Mr. Burns participated in the hearing telephonically.  Because Mr. Burns resides in Rochester, New York, and Defendant would be released to Florida, the Court specified that Mr. Burns would have to

3

"maintain daily contact with Mr. Harry either via phone or via audio, like a Zoom video conference, on a daily basis." Tr. at 5 (May 21, 2024). This would allow Mr. Burns to "report to the Court if he . . . became aware of any efforts by Mr. Harry to -- any planned efforts to not comply with the conditions of release, including cutting his bracelet, leaving the vicinity, leaving the house to which he would be living." *Id.* at 5–6. Mr. Burns was advised by the Court that he would "have to Facetime [Defendant] on [his] phone every single day and make sure [Defendant's] there and that he is abiding by all the terms that I will review with you." *Id.* at 7. The Court also imposed electronic monitoring on Defendant's use of electronic devices. *Id.* at 8.

The Court noted that it had "never had more terms in a bail hearing in 20 years on this job," but that this combination was necessary to "reasonably assure [Defendant's] appearance at trial." *Id.* at 10. At several times during the hearing, the Court warned the Defendant that he would be remanded if he failed to abide by any of the conditions. *See id.* at 8, 9, 10, 12–13, 17–18. The Court noted, for example, that "if pretrial in Florida makes a site visit and [finds Defendant] sitting outside of the house without getting permission from them, [Defendant will] be remanded and that will be that." *Id.* at 18.

On or about April 10, 2026, the U.S. Probation Office contacted Defendant's third-party custodian, Mr. Burns. Mr. Burns answers to questions revealed that he was not been maintaining daily contact with Defendant in the manner specified by the Court. Specifically, Mr. Burns's answer indicated that, although he exchanges text messages with Defendant daily, he does not call or Facetime Defendant every day. The duration and extent of the noncompliance is presently unknown.

## ARGUMENT

Defendant seeks to relax his conditions of release to an extent that has never existed in this case, and Defendant seeks that relief despite failing to comply with his existing conditions of release. The Court should deny Defendant's motion to end home incarceration as it remains necessary to assure his appearance for trial.

As an initial matter, Defendant's non-compliance with the conditions of release is material. The purpose of a third-party custodian is, in part, to provide monitoring such that the defendant either follow the conditions of release or the court is immediately notified of non-compliance. *See United States v. Reinhart*, 975 F. Supp. 834, 840 (W.D. La. 1997) (denying release because defendant "identified no parent or other third party custodian who could assure that [the defendant] is monitored 24 hours a day"); *see also United States v. Caldwell,* 540 F. Supp. 3d 66, 84 (D.D.C. 2021) (affirming denial of release where proposed custodians "may also not have a means to know [the defendant's] whereabouts or activities to be able to report any violations"). That purpose is not served when a custodian only casually interacts with a defendant. *See*, *e.g.*, *United States v. Navarro*, 241 F. Supp. 2d 36, 38 (D. Me. 2003) (holding custodian insufficient where proposed custodian "claims to see [the defendant] several times each week, but it is apparent that that occurs, if it does, only because they often reside in the same neighborhood and those observations by her of Defendant are only in passing and involve no meaningful interaction").

Here, the Court allowed Mr. Burns to serve as the third-party custodian, despite living in New York, on the condition that Mr. Burns maintain daily contact with the Defendant by something "like Zoom" or Facetime, both of which are platforms that enable live, two-way, audio-visual communication. The Court determined this was necessary to assure Defendant's presence at trial. The Court's requirement was clearly communicated to Mr. Burns and to the Defendant,

as were the consequences of Defendant's compliance with the conditions of release.  Despite those warnings, Mr. Burns is not maintaining such contact and, notably, Defendant is apparently not calling Mr. Burns to maintain such contact either.

Under these circumstances, the Court should not further relax Defendant's conditions of release and give him—for the first time since his arrest in 2019—the ability to travel throughout Florida and New Jersey.  *See* Dkt. No. 347 at 2 (restricting Defendant's travel to New Jersey and Florida).  This is consistent with the Court's prior findings regarding Defendant's risk of flight and Defendant's current non-compliance.

Moreover, even if the Court were inclined to remove home incarceration, the next, less restrictive level of supervision would include (a) continued location monitoring, (b) curfew, *and* (c) home detention with exceptions for approved activities.  Lowering the restriction in this manner would provide the Probation Office with better oversight of the Defendant as his September 2026 trial approaches.

## **CONCLUSION**

For the reasons discussed above, the Court should deny Defendant's motion to remove the condition of home incarceration.

Respectfully Submitted,

*s/Darren C. Halverson*

By:  DARREN C. HALVERSON
NICHOLAS K. PEONE
Trial Attorneys
Criminal Division, Fraud Section
U.S. Department of Justice

Dated: April 16, 2026